1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| AMANDA KENNEDY; and PETER KENNEDY, | ) ) Case No.: CV08-02988 GAF (OPx) |
| Plaintiffs, | ) ) ) **FINDINGS OF FACT AND** |
| v. | ) **CONCLUSIONS OF LAW** ) |
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) Honorable Gary A. Feess |
| Defendants. | ) ) ) |

## I.

## INTRODUCTION

Plaintiffs Amanda and Peter Kennedy were injured in an automobile accident in which the car in which they were riding was struck by an on-duty United States Marine Sergeant. The United States conceded liability, and on July 27, 2009, the case proceeded to trial on damages only. The Court received post-trial briefing and heard closing argument on September 15, 2009. Thereafter, the parties submitted amended proposed findings of fact and conclusions of law for the Court's review and the matter stood submitted. Having further reviewed the post-trial briefs, the proposed findings and conclusions, and considered the arguments of counsel, the following sets forth the Court's findings of fact and conclusions of law in this case.

## II.

## FINDINGS OF FACT[1]

**A.   Background**

*1. The Lawsuit*

This was a non-jury action for personal injury brought by Plaintiffs Amanda and Peter Kennedy against Defendant the United States of America under the Federal Tort Claims Act, 28 U.S.C. §§1346 and 2671 *et seq.*, and against Defendant Avis Rent a Car Systems, LLC, following a March 24, 2006 traffic collision involving Plaintiffs and an employee acting in the course and scope of his employment with the United States Marine Corps ("USMC").   Prior to trial, Plaintiffs entered into a stipulation to dismiss Avis from the lawsuit.  The Order dismissing Avis was entered July 31, 2009.  See Docket No. 49.  In this lawsuit, Plaintiffs seek compensation for both economic and non-economic damages.

*2. The Accident*

At the time of the accident,  Kennedy was twenty years old and a USMC Lance Corporal stationed at Marine Corps Base ("MCB") Twentynine Palms where she worked as a personnel clerk.  Plaintiff Peter Kennedy is Ms. Kennedy's brother who, at the time of the accident, was nineteen years old.  He was a passenger in Ms. Kennedy's vehicle when it was struck just outside the gate at the MCB.  The United States concedes that it breached a duty owed to Plaintiffs with regard to this accident.  Amanda Kennedy suffered injuries to her left wrist and to both ankles which required extensive surgery to repair the damage.

**B.   Post Accident**

*1. Surgeries*

After the accident, Plaintiffs were taken to Desert Regional Medical Center

---

[1]  Unless otherwise noted (*e.g.*, by a citation to the Court Reporter's Transcript of Trial Proceedings ("RT")), the facts listed in the [Proposed] Findings of Fact have been stipulated by the parties and detailed in the Court's June 1, 2009 Pretrial Conference Order, *see* Docket No. 32.

in Palm Springs, California, where on March 25, 2006, Ms. Kennedy underwent surgery to repair fractures of her left wrist and forearm, her left ankle, which was so seriously injured that it required internal and external fixation, and surgery to repair injuries suffered in her right ankle.   She had additional surgery on her left ankle on April 1, 2006.  Ms. Kennedy was hospitalized for eleven days at Desert Regional Medical Center.  As a result of her injuries she has had approximately nine additional surgeries to repair the injuries to her wrist and ankles.  (RT at 59.) These surgeries include the following:

> (1)  Ms. Kennedy underwent surgery on June 28, 2006 at Barnes-Jewish West County Hospital in St. Louis, Missouri to remove hardware from her left wrist.

> (2)  Ms. Kennedy underwent outpatient surgery on August 15, 2006 at Barnes-Jewish West County Hospital to remove internal hardware in her right ankle.

> (3)  Ms. Kennedy underwent surgery on her left ankle at Washington University Medical Center in St. Louis, Missouri on May 19, 2008.

### 2.  Return to Active Duty and Discharge

Ms. Kennedy returned to MCB Twentynine Palms for active duty with the USMC in October 2006.  Due to her injuries, Ms. Kennedy was found unfit for service by the USMC Physical Evaluation Board, transferred to the USMC Temporary Disability Retirement List in January 2008, and discharged from the USMC in February 2008.  Ms. Kennedy currently remains on the Temporary Disability Retirement List with a disability rating of 30% due to injuries; she will be re-evaluated every eighteen months to determine if there has been a change in her disability and whether she is eligible for a full medical retirement.  Since the accident, Ms. Kennedy has received medical insurance coverage, retirement pay and benefits from the United States.

### 3.  Post-Discharge Activities

Ms. Kennedy currently lives with her parents in Missouri.  Since being discharged from the USMC in February 2008, Ms. Kennedy has held two jobs as a waitress and cocktail server.  After the accident, Ms. Kennedy worked for a short period as a cocktail server four to six hours per day three to four days a week.  Ms. Kennedy continues to experience pain at a level of 7 to 8 on a 10 scale with 10 being the worst.  (RT at 277.)   Ms. Kennedy would experience swelling, joint pain and stiffness after working a shift as a cocktail waitress.  (RT at 61; 70.)  After the accident she was unable to run, dance, or wear high heels without pain, and experienced difficulty in going up and down stairs.  (RT at 64-65.)

### C.  Plaintiff Amanda Kennedy's Damages

### 1.  Past Medical Expenses

TRICARE[2] is a health care program of the United States Department of Defense and provides civilian health benefits for military retirees such as Ms. Kennedy.  See 10 U.S.C. §§ 1072 & 1097, et seq.; 32 C.F.R. §§ 199.1 & 199.17, et seq.  Ms. Kennedy's past medical expenses were $273,824.  Ms. Kennedy's past medical bills were paid by the United States via TRICARE medical coverage.

### 2.  Future Medical Expenses

Under the terms of Ms. Kennedy's current USMC Disability Retirement status, she will continue to receive medical benefits through TRICARE coverage in the future.  See RT at 243-44:24-2.   All of Ms. Kennedy's surgical procedures to date have been provided by non-VA doctors at private non-VA facilities.

Future surgery on Ms. Kennedy's right ankle is not likely required.  See RT at 17:11-21 (testimony of Dr. Phillip Kwong, Orthopedic Expert retained by Plaintiffs); RT at 264:4-25; 291:20-3 (testimony of Dr. Carol Frey, Orthopedic Expert retained by the United States).  However, there is little question that Ms.

_____

[2]  Formerly known as the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS).

1  Kennedy will need future surgery on her left ankle.  She suffered a shattering

2  fracture of the left tibia and fibula that required open reduction with both internal

3  (rods, plates and surgical screws) and exeternal fixation (external frame and pins).

4  (RT at 12-13.)  Experts for both parties agree that Ms. Kennedy will likely require

5  an ankle fusion at some time in the future.  (RT at 26, 268.)  However, an ankle

6  replacement surgery is contraindicated in Ms. Kennedy's case because of the

7  predicted high failure rate of such surgeries in younger patients.[3]  (RT at 272.)

8  Even Plaintiff's expert concedes that he has never performed such a surgery on

9  anyone in Plaintiff's age group, RT at 37, and that even with such surgery an ankle

10 fusion would likely be required at some future date.  (RT at 26.)  However, it is

11 unlikely that Ms. Kennedy will require a sub-talar fusion in the future and that her

12 related arthritis can be treated and controlled without the surgery.  (RT at 276;

13 294.)

14       The cost to perform future surgery on Ms. Kennedy's left ankle and to care

15 for both of her ankles is $69,400.   See RT at 267:6-10; 272:6-7; Trial Exhibit

16 114.[4]  United States); RT at 37-38:23-12 (testimony of Dr. Phillip Kwong,

17 Orthopedic Expert retained by Plaintiffs).

18       *3.  Vocational Rehabilitation*

19       While serving in the USMC, Ms. Kennedy received training in personnel

20 administration, worked successfully as a personnel clerk, provided customer

21

22       [3] The Government's expert, who the Court found to be experienced, knowledgeable, and
23 credible, noted that ankle replacements are considered investigational with no Type 1 or 2
   medical studies having been published on the use of such devices.  See RT at 274: 8-18
24 (testimony of Dr. Carol Frey, Orthopedic Expert retained by United States).  The Court is
   persuaded that attempting an ankle replacement in a person of Ms. Kennedy's age, given the
25 current state of replacement technology, would be extremely ill advised.

26       [4]  The Court agrees with the Government's concern over the ability of Ms. Kennedy's
   orthopedic expert to provide accurate estimates on the costs of Ms. Kennedy's future medical
27 expenses.  Even Dr. Kwong acknowledged that he was just giving a "rough estimate" of medical
   costs, was not an expert on what hospitals charge, and had no idea where to look up such data.
28 See RT at 39:9-13; 40:12-18 (testimony of Dr. Phillip Kwong, Orthopedic Expert retained by
   Plaintiffs).

1  service to both Marines and civilians, and maintained military service records,

2  financial, and personnel information for an entire Marine Corps Base.  See RT at

3  49:13-22; 49-50:24-11.  The job responsibilities and duties of a Marine Corps

4  personnel clerk are transferrable to a similar civilian job.  See RT at 87-88:20-19.

5  Ms. Kennedy took college equivalent courses while in the USMC including math,

6  personal finance, record management, and underwent on the job typing, database,

7  and computer training.  This training and education was designed to increase her

8  skills as a Marine Corps personnel clerk and was transferable to a civilian job.  See

9  RT at 138:18-24; 153-54:24:6; RT at 194-95:22-6.

10       Ms. Kennedy presented no persuasive evidence that she requires further

11  vocational training to compete for work in the private sector.  Her retained

12  vocational expert spoke to her once over the phone, never met with her in person,

13  did not do any vocational testing of her, does not know how fast she types before

14  or after the accident, and does not know what computer programs she used while in

15  the USMC.  See RT at 153:7-16; 159:2-13 153-54:24:6.  His opinion regarding the

16  need for vocational training was not supported by evidence relevant to her

17  circumstances.  Furthermore, Ms. Kennedy requires vocational rehabilitation, a

18  wide spectrum of free educational and vocational rehabilitation services and

19  programs (including the Montgomery G.I. Bill and the Veterans Affairs Vocational

20  Rehabilitation and Employment Program) are available free to Ms. Kennedy

21  through the benefits and programs provided to her, and to which she is currently

22  eligible for.  See RT at 68:4-6; RT at 161-62: 23-13; 162-63:16-13; RT at 190:15-

23  24; 191:3-21; 195:7-14; RT at 238-39:16-6.

24       **4.    *Ms. Kennedy's Past Lost Earnings***

25       Ms. Kennedy enlisted in the USMC for a term of four years that was to

26  expire in September 2008.  At the time of the March 2006 accident, Ms. Kennedy

27  was receiving a total salary of $2,816 per month (which comprised her basic pay of

28  $1,790 per month and subsistence pay of $703 per month).  See RT at 304-05.

After the March 2006 accident, Ms. Kennedy returned to active duty with the USMC in October 2006 until her placement on the USMC Temporary Disability Retirement List in January 2008. She received her full military pay during this period. <u>See</u> RT at 67-68.

When Ms. Kennedy was placed on the Temporary Disability Retirement List, she began receiving a retirement annuity from the United States in the amount of $775 per month. <u>See</u> RT at 305. Ms. Kennedy currently receives a retirement annuity from the United States in the amount of $813 per month. <u>See</u> RT at 305.

### *5. Ms. Kennedy Has No Future Lost Earnings*

Ms. Kennedy bases her claim to future lost earnings entirely on her contention that she intended to, and would have been accepted for re-enlistment, and anticipated remaining in the USMC until retirement after 20 years service. She presented no evidence on any alternative lost earnings because she claimed that her most likely outside employment, law enforcement, would have paid her more than the USMC. Ms. Kennedy's assumptions were incorrect as the facts set forth below indicate. She was a poor student in high school, RT at 162-63, failed to last a single semester in community college before dropping out, RT at 303, scored at the bottom of the second tier in her Armed Forces Qualifying Test (66th percentile),[5] RT at 141-42, and received performance and conduct marks that ranked her as an average Marine who received a recommendation from her supervisor that was highly likely to eliminate any chance she had for reenlistment. (See below.)

### A. Ms. Kennedy Was an Unlikely Candidate for Reenlistment

Evidence was presented detailing the policies and procedures for Marines to request and submit for reenlistment. The evidence demonstrated that due to specific and stringent restrictions, only a small percentage of Marines are permitted to reenlist. <u>See</u> RT at 207-08:23-18.

---

[5]The first tier was 93rd to 99th percentile; the second tier stretched from 92nd down to the 65th percentile. RT at 142.

1        Reenlistment in the Marine Corps is the exception and not the norm.  Over

2   70 percent of Marines leave after the end of their initial reenlistment.  <u>See</u> RT at

3   214:14-17; 215:4-13.  Only 35.5 percent of Marines were permitted to reenlist in

4   fiscal year 2008 (the year Ms. Kennedy would have been eligible to apply for

5   reenlistment).  <u>See</u> RT at 214:14-17; 215:4-13.   More particularly, only 220

6   Marines, 2.6 percent of Marines in the Administration Personnel Clerk Military

7   Occupation Specialty (Ms. Kennedy's  Military Occupation Specialty) were

8   permitted to reenlist in fiscal year 2008.  <u>See</u> RT at 214:14-17; 215:4-13.

9   The Marine Corps is extremely selective choosing only the best and most fully

10  qualified Marines for promotion.  <u>See</u> RT at 225-26:22-11.

11       When a Marine seeks promotion from the rank of Lance Corporal (Ms.

12  Kennedy's rank at the time of the March 2006 accident) to Corporal, the

13  promotions system goes from automatic advancement (based on time in grade and

14  service) to a highly competitive points based system where the Marine's individual

15  composite score must meet or exceed the changing cutting scores that are

16  announced by the Commandant of the Marine Corps.  <u>See</u> RT at  228:12-19;

17  230:5-11.  These cutting scores are used to control the number of promotions based

18  on the changing manpower needs of the Marine Corps.  <u>See</u> RT at 228:12-19;

19  230:5-11.

20       It was highly unlikely that Ms. Kennedy would have been promoted or been

21  allowed to reenlist based on her performance as a Marine.  Ms. Kennedy was

22  considered an average Marine not only by her commanding officers, but also based

23  on her performance and conduct marks, and the objective standards set forth in

24  various Marine Corps Orders.  <u>See, e.g.</u>, RT at 87:10-19.  At times, Ms. Kennedy

25  was a below average Marine as demonstrated by the counseling she received due to

26  insubordination and lack of respect towards and interactions with her chain of

27  command.  <u>See</u> RT at 10:18-25; 111-12:11-5; 117:3-6.

28       Ms. Kennedy's commanding officer, Chief Warrant Officer Scalzo, would

have given Ms. Kennedy a "recommendation with confidence" rating for reenlistment which was not the highest recommendation that could be given to a Marine.  The highest recommendation was a "recommendation with enthusiasm." See RT at 89:8-16.  In his more than 20 years in the Marine Corps, Scalzo has recommended approximately 20 Marines under his command for reenlistment "with confidence" and only one was permitted to reenlist.  See RT at 89-90:24-6. As Scalzo explained in response to the Court's questioning:

> The Court: When you say, you know of one that comes to mind of the couple of dozen, does that mean you recollect as to the others that they were not granted reenlistment?
>
> The Witness:  I know it's very rare that the with confidence is reenlisted – selected by the Headquarters Marine Corps.
>
> The Court: So Headquarters wants to hear the recommendations with enthusiasm?
>
> The Witness: Yes, sir.

(RT at 90.)

In addition, Ms. Kennedy also faced a barrier to reenlistment because her Military Occupation Specialty –  Personnel Clerk – was considered fast-filling and extremely competitive, with the USMC only reenlisting and promoting the highest quality Marines.  See RT at 210-11:16-14; 216-17:19-1; RT at 88-89:20-4; RT at 119:13-19.

## B.  Ms. Kennedy's Employment Prospects

To calculate her lost future earnings, Ms. Kennedy's retained economist assumed only one scenario: that Ms. Kennedy would have remained in the Marine Corps for 20 years.  He never provided calculations for a scenario where Ms. Kennedy was not permitted to reenlist with the USMC.  See RT at 169:18-21; 184-85:13-1.

According to Ms. Kennedy's vocational rehabilitation expert, Ms. Kennedy

1   is qualified to obtain employment given her current limitations, as a civilian

2   administrative assistant, secretary, or clerical assistant with pay ranging from

3   $2,238 to $2,452 per month as an administrative assistant, $1,836 to $2,364 as a

4   secretary, and $1,783 to $1,968 as a clerical assistant.  RT at 151-52:22-6.  The

5   salary ranges available to Ms. Kennedy provided by experts for the United States

6   were similar: $1,972 to $2,236 per month for private sector salaries for

7   administrative positions and $2,841 to $4,455 for public sector salaries.  See RT at

8   309-10:16-17; see also RT at 193:7-14; 194:5-21 (testimony of Amy Koellner, the

9   United States' vocational rehabilitation expert) ($2,307 per month for government

10   sector administrative positions and $1,920 to $2,240 per month for private sector

11   administrative positions).   Possible employment in law enforcement or fire

12   fighting need not be considered because  Ms. Kennedy never expressed a desire to

13   enter the law enforcement or fire fighting fields.  See RT at 155:8-25.  Moreover,

14   Plaintiff offered no evidence that Ms. Kennedy would otherwise have been a likely

15   candidate for such a position except to elicit conclusory testimony that many ex-

16   military personnel pursue law enforcement careers.

17          While in the military, Ms. Kennedy earned approximately $1,600 per month.

18   See RT at 168:11-18 (testimony of David Weiner, Plaintiffs' economist).   As

19   noted above, all vocational experts agree that Ms. Kennedy can currently work and

20   earn a salary, and the Government presented undisputed evidence that she can do

21   so with no impact on her continuing to receive her military retirement benefits and

22   annuity payment.  See RT at 237:1-6.  Ms. Kennedy's salary in a civilian

23   administrative or clerical Position would be greater than her military pay.

24          **6.  *Ms. Kennedy's Non-Economic Damages***

25          Ms. Kennedy is not being treated for her left wrist and does not require any

26   future treatment for that injury.  See RT at 68:7-13 (testimony of Plaintiff Amanda

27   Kennedy).  Ms. Kennedy's left and right ankle surgeries were successful in the

28   sense that she is ambulatory and functioning..  See RT at 258:7-10; 278:16-20.

1  Ms. Kennedy's orthopedic expert testified that Ms. Kennedy has "managed quite

2  well" with the injury to her right ankle and has maintained the function of that

3  ankle "reasonably well." <u>See</u> RT at 16:13-25.

4       Three years after the accident, Ms. Kennedy reported to Dr. Frey that, on a

5  10 scale with 10 being worst, she was at about 7-8 on the scale.  RT at 277.[6]

6  According to the Government's expert who testified regarding her left ankle:

7            Even looking back just to see consistency with Dr. Klein, that's

8            exactly where she had the pain; and she has a reason for the pain

9            there; that she has most of her radiographic findings in the left ankle.

10           Most of her pain is in the left ankle.  Her history is left ankle pain.

11           Her major injury was in her left ankle.  So, ye, I think she'll have pain

12           in the left ankle.  And so in answer to your question: Yes, I predict

13           pain and poor outcome for the left ankle.

14  (RT at 277.)

15       This testimony is hardly surprising given that her left ankle was shattered

16  and that she has had numerous surgeries to deal with the damage she suffered.  The

17  Government's effort to minimize the negative impact of the injury on Ms.

18  Kennedy's quality of life is unpersuasive.   Thus, although she is ambulatory and

19  can engage in some of her prior activities, there is little question that Ms. Kennedy

20  suffers and will continue to suffer limitations on her activities and to experience

21  pain related to the injury, particularly the left ankle injury.

22

23  **III.  <u>Plaintiff Peter Kennedy's Damages</u>**

24       Mr. Kennedy is currently unemployed and living in Missouri.  Mr. Kennedy

25

26  ─────────────────

27  [6] There is some evidence in the record that her left ankle pain was reported at a level 2.
    <u>See</u> RT at 36:4-14 (testimony of Dr. Phillip Kwong, Orthopedic Expert retained by Plaintiffs);
    RT at 278:7-20 (testimony of Dr. Carol Frey, Orthopedic Expert retained by the United States).

28  However, viewing the record as a whole, the Court finds that the completion of Ex. 113 was
    likely in error on this point.

1   has been billed $8,668.62 for his past medical expenses, but has not paid for any of

2   these expenses.  See RT at 74:7-12.  Mr. Kennedy experienced pain for

3   approximately a month as a result of the soft tissue injuries he sustained as a result

4   of the accident at issue in this case.  See RT at 74:13-20.  Mr. Kennedy was

5   involved in another automobile accident approximately one month after the

6   accident at issue in this case.  See RT at 74:13-20.  Mr. Kennedy's injuries relating

7   to the accident at issue in this case were limited to soft tissue with no fractures or

8   dislocations, he is no longer being treated for his injuries, he does not have

9   continuing medical problems related to the accident, and has never been advised by

10  a doctor to refrain from any physical activity.  See RT at 75:2-5; see also Docket

11  No. 32, Court's June 1, 2009 Pretrial Conference Order.

**III.**

**CONCLUSIONS OF LAW**

**A.**   **California Law Applies Under The Federal Tort Claims Act**

The Federal Tort Claims Act ("FTCA") preconditions liability and

jurisdiction upon proof of an actionable duty, causation and recoverable damages

under the law of the state wherein the conduct complained of occurred.  See 28

U.S.C. §§1346(b) & 2674; Dalehite v. United States, 346 U.S. 15, 52-53; 73 S.Ct.

936, 97 L.Ed. 1427 (1953).  To have a cognizable claim, the claim must arise from

the negligent or wrongful act of a government employee acting within the scope of

his employment under circumstances where the United States, if it were a private

individual, would be liable under the law of the state where the claim arose.  See

id.  California law applies to this case because the accident occurred in California.

**B.**   **Plaintiffs Must Prove Their Injuries Were Caused By the United States'**
        **Acts**

In California, plaintiffs must prove by a preponderance of the evidence that

their claimed damages were caused by the negligent acts or omissions of an

employee of the United States.  See 28 U.S.C. §2674; CAL. EVID. CODE § 115.

1   Given the admission by the United States that it breached a duty owed to Plaintiffs
2   with regard to this accident, this case centers on the amount of damages directly
3   caused by the accident.

4   **C.**   **Plaintiffs' Recovery Is Governed By The Limitations Of Federal Law**

5           Plaintiffs have the burden of establishing their alleged losses.

6           **1.  *Future Damages***

7           A plaintiff establishes liability based on events that have already occurred,
8   but can recover prospective damages in an appropriate case.  <u>See generally</u> 6
9   WITKIN, SUMMARY OF CALIFORNIA LAW, Torts § 1552, at 1027 (10th Ed. 2005).
10  Witkin notes that:

11              The requirement of "certainty" . . . cannot be strictly applied where
12              prospective damages are sought, since probabilities are really the basis
13              for the award.

14  Thus, lost future earnings are often  recoverable in a personal injury case. In <u>United
15  States v. Furumizo</u>, 381 F.2d 965, 970 (9th Cir. 1967), the Ninth Circuit noted:

16              Baker first attacks subparagraph (c), in which the court determined
17              that it was reasonably certain that Furumizo would have been
18              promoted to Grade GS-11 within 10 years. It is urged that this is pure
19              speculation. In a sense, of course, any prediction of this kind is
20              speculative. If things were not as they are, they would be quite
21              otherwise, but no one can be certain as to just how they would be
22              otherwise. Nevertheless, in a wrongful death case, loss of future
23              earnings must be estimated. In that sense, the court must speculate.
24              All that is required is 'reasonable certainty,' <u>Condron v. Harl</u>, 1962,
25              46 Haw. 66, 72, 374 P.2d 613, 617, an uncertain phrase used to limit
26              what must inevitably be a decision lacking in certainty. It is not the
27              law, as Baker seems to suggest, that the court cannot take into account
28              probable promotions.

1    In short, upon adequate proof, a plaintiff may recover damages that are

2    reasonably expected to be suffered in the future.  An award of future economic

3    damages, such as the loss of a stream of income, must be discounted to present

4    value.   United States v. English, 521 F.2d 63, 71-72 (9th Cir. 1975).

5              *2.  Punitive Damages*

6    Punitive damages may not be assessed against the United States.  See

7    English, 521 F.2d at 70; Felder v. United States, 543 F.2d 657, 665 (9th Cir. 1976).

8

9              *3.  The Collateral Source Rule*

10    The "collateral source rule" holds that the payment of compensation from a

11   source wholly independent of the tortfeasor should not be deducted from the

12   damages that the plaintiff is otherwise entitled to collect from the tortfeasor. E.g.

13   Hrnjak v. Graymar, Inc., 4 Cal. 3d 725, 729 (1971); Canister v. Emergency

14   Ambulance Service, 72 Cal. Rptr. 3d 792, 807 (Ct. App. 2008).  Defendant

15   contends that the "collateral source rule" does not apply to Amanda Kennedy's

16   recovery of medical expenses because the United States cannot be viewed as a

17   collateral source in present circumstances.  Feeley v. United States, 337 F.2d 924,

18   926 (3d Cir. 1964).  Plaintiff does not seek recovery of past medical payments

19   which moots the issue of the "collateral source" rule to that extent.  Nevertheless,

20   because Defendant contends that the rule applies to a claim for future medical

21   expenses, the Court must address the rule.

22    Supreme Court jurisprudence has established the right of service personnel

23   to recover under the FTCA.  In Brooks v. United States, 337 U.S. 49 (1949), the

24   Supreme Court considered whether servicemen who suffered injuries that were not

25   incident to the performance of their military duties could recover damages under

26   the FTCA.  In that case, which involved injuries suffered in an automobile

27   accident, the Supreme Court held that the FTCA applied and that the exception for

28

-14-

1   injuries suffered during overseas and combatant activities did not.  Id. at 51-52.[7]  In

2   discussing the remedies available to service personnel, the Supreme Court noted

3   that service personnel may recover damages under two different remedial schemes

4   and that it would not require an election of remedies where Congress required

5   none, but stated:

6           [T]his does not mean that the amount payable under servicemen's

7           benefit laws should not be deducted, or taken into consideration, when

8           the serviceman obtains judgment under the Tort Claims Act. Without

9           the benefit of argument in this Court, or discussion of the matter in the

10          Court of Appeals, we now see no indication that Congress meant the

11          United States to pay twice for the same injury. Certain elements of tort

12          damages may be the equivalent of elements taken into account in

13          providing disability payments. It would seem incongruous, at first

14          glance, if the United States should have to pay in tort for hospital

15          expenses it had already paid, for example.

16  Id. at 53-54.

17          The comment is noteworthy because, although it indicates a view about the

18  collateral source rule, it plainly indicates that the issue of double recovery had not

19  been briefed or argued.  It is clear from the entirety of the opinion that the recovery

20  of damages was tangential to the principal question of the soldier's right to bring

21  suit under the statute.   However, taking its cue from the Supreme Court, the Fourth

22  _____

23          [7]Compare Feres v. United States, 340 U.S. 135 (1950), in which the Court considered
    three separate actions: (1) Feres – plaintiff's estate brought suit against the government for death
24  allegedly caused by negligence in connection with a barracks fire; (2) Jefferson – negligence in
    connection with surgery performed while Jefferson was on duty in the army; (3) Griggs –
25  wrongful death in connection with negligent treatment by Army surgeons.  In each case the
    injury occurred while the plaintiff was on active duty, and in each case he allegedly suffered
26  injury due to the negligence of others in the armed forces.  The question was whether Brooks
    permitted these lawsuits, which were "incident to service."  The Court in that case concluded
27  that the Government had no liability to the servicemen under the FTCA and never reached the
    issue of damages.  See also United States v. Brown, 348 U.S. 110 (1954), harmonizing the
28  rulings in Brooks and Feres.

-15-

1    Circuit on remand held that: (1) plaintiff could not recover as damages any medical

2    expenses that were paid by the government; (2) any lost earnings for a period when

3    he drew his army pay; and "the award should be diminished by the amount which

4    he has received or is to receive from the government by way of disability benefits."

5    United States v. Brooks, 176 F.2d 482, 484 (4th Cir. 1949).

6         The Ninth Circuit elaborated and refined this approach in United States v.

7    Hayashi, 282 F.2d 599 (9th Cir. 1960), a wrongful death action in which the

8    government argued that the trial court erred in refusing to deduct social security

9    payments received by plaintiffs from the damage award.  Specifically, the

10   government claimed that the damage award due to the death of her husband should

11   have been reduced by the "mother's insurance benefits" paid under the Social

12   Security Act.  The Ninth Circuit wrote:

13          The Federal Tort Claims Act, 28 U.S.C.A. § 2674, limits the award for

14          damages to that which is compensatory in nature. Massachusetts

15          Bonding & Ins. Co. v. United States, 352 U.S. 128, 77 S.Ct. 186, 1

16          L.Ed.2d 189.  In applying this principle it has been held in effect that

17          where the injured person is receiving injury-related benefits payable

18          from unfunded general revenues such benefits are to be deducted from

19          any federal tort claims award. The theory is that to the extent of such

20          benefits compensation is already being made from the same unfunded

21          source drawn upon in paying the federal tort claims award.

22          Thus, where the Veterans Administration has paid the hospital

23          expenses incurred in connection with the injury no award is to be

24          made therefor in a federal tort claims action.  Likewise, where

25          disability benefits have been paid under the Veterans Act an award

26          against the government in a Federal Tort Claims Act case is to be

27          reduced by the amount of such benefits.  In each case the benefits are

28          paid from unfunded general tax monies appropriated for the purpose,

1            the same source from which appropriations are made for the purpose
2            of paying federal tort claims awards.

3  Id. at 603.   However, the circuit refused to offset the damage award for benefits

4  received from a different source.  "On the other hand, where the injured person has

5  received benefits for the injuries under a National Service Life Insurance policy

6  [Citation], or under the Civil Service Retirement Act of 1956, 5 U.S.C.A. § 2251 et

7  seq. ([Citation]), the award made in a federal tort claims case is not to be reduced

8  by the amount of such benefits. These benefits are not paid from unfunded general

9  revenues but from a special fund supplied in part by the beneficiary or a relative

10 upon whom the beneficiary is dependent." Id.  In short, the case holds that the

11 collateral source rule applies if the source of funds is truly collateral and may

12 include government benefits received from specially funded sources.  See also

13 Siverson v. United States, 710 F.2d 557, 559-60 (9th Cir. 1983) (medicare benefits

14 do not offset damages paid by VA under FTCA because plaintiff contributed to the

15 medicare fund through Social Security contributions); Feeley, 337 F.2d at 933-34

16 (plaintiff not entitled to recover medical expenses in case where all medical

17 treatment provided by the VA at no cost to plaintiff because "to allow the plaintiff

18 to recover for this item in his damages would not only result in a double-recovery

19 for him, but also a double-payment out of the general treasury by the United

20 States.").  Feeley also noted that the collateral source rule does not require an

21 offset of one element of damages (e.g., medical payments) against another damage

22 element (pain and suffering). Id. at 934.

23        In sum, the collateral source rule does not apply in FTCA cases where

24 payment is received from the government out of the general fund but does not

25 apply where the plaintiff has received payment from some source other than the

26 general fund.   Even then, however, this rule applies only to past payments.

27 Molzof v. United States, 6 F.3d 461, 467 (7th Cir. 1993); Ulrich v. Veteran's

28 Admin. Hosp., 853 F.2d 1078, 1084 (2d Cir. 1988); Feeley, 337 F.2d at 935.   As

-17-

Feeley noted:

> [A]cceptance of the government's position would result in forcing the plaintiff, financially speaking, to seek only the available public assistance.  Private medical care would be obtained at the plaintiff's own expense. We think that this is an unconscionable burden to place on the plaintiff. A victim of another's tort is entitled, we think, to choose, within reasonable limits, his own doctor and place of confinement, if such care is necessary. To force a plaintiff to choose between accepting public aid or bearing the expense of rehabilitation himself is an unreasonable choice. The plaintiff may not be satisfied with the public facilities; he may feel that a particular private physician is superior; in the future because of over-crowded conditions he may not even be able to receive timely care. These are only a few of many considerations with which an individual may be faced in selecting treatment. The plaintiff's past use of the government facilities does not ensure his future use of them. He will now have the funds available to him to enable him to seek private care. He should not be denied this opportunity.

337 F.2d at 934-35.[8]  Thus, the Court considers the "collateral source" rule inapposite in this case.

### 4.  Interest

The FTCA precludes an award of pre-judgment interest.  Post-judgment

---

[8]Based on this discussion, the Court concludes that the out-of-circuit authority, cited by the Government for the proposition that TRICARE medical benefits and collateral and deductible because they are non-collateral, are not controlling.  Compare Mays v. United States, 806 F.2d 976, 977 (10th Cir. 1986), and Dempsey v. United States, 32 F.3d 1490, 1495-96 (11th Cir. 1994); with Hayashi.   To the extent that Kennedy makes any contribution to the premium payments for this coverage it constitutes a collateral source.  In the end, however, because there is no claim for past benefits and because the collateral source rule does not apply to potential future payments, the issue appears to be moot.

interest, if applicable, is governed by 31 U.S.C. § 1304.

### 5. Attorney's Fees

Attorney's fees regarding Plaintiffs' claims are covered by the FTCA, which precludes recovery of fees in excess of 25% of any settlement or judgment.  See 28 U.S.C. § 2678.

## D.   Plaintiff Peter Kennedy's Damages

Mr. Kennedy suffered minor physical injuries in the accident, all of which have since resolved, and does not seek either lost past or future earnings.  Mr. Kennedy will not require any future medical care for those physical injuries.

Mr. Kennedy was involved in another automobile accident shortly after the one at issue in this case.  Accordingly, it is unclear to what degree, if any, the non-economic damages are attributable to the accident in this case

**1.** **Mr. Kennedy is hereby awarded his past medical expenses of $8,668.62.**

**2.** **Mr. Kennedy suffered moderate pain and discomfort for approximately one month after the accident and is awarded general damages of $2,500.**

## E.   Plaintiff  Amanda Kennedy's Damages

### 1. Past Medical Expenses

Ms. Kennedy does not seek, and therefore will not be awarded, damages for past medical expenses.

### 2. Future Medical Expenses

To recover damages for future medical expenses, plaintiffs must prove:

    a.   the reasonable value of each of the expected future medical expenses,

    b.   that the future medical care, services and supplies are reasonably certain to be needed and given in treatment of the injury, and

    c.   that the condition requiring the future medical care is causally

connected to the injuries inflicted by defendant.

See Dimmick v. Alvarez, 196 Cal. App. 2d 211, 216 (1961);  Holahan v. McGrew, 111 Cal. App. 430, 443 (1931); Hoffman v. Southern Pacific Co., 101 Cal.App. 218 (1929).   Future medical expenses may not be awarded if they are deemed speculative.  See Scognamillo v. Herrick, 106 Cal. App. 4th 1139, 1150-51 (2003). Both orthopedic experts concluded that Ms. Kennedy will not likely require future surgery on her right ankle.  Accordingly, she is not entitled to any recovery for any such future medical expenses.  However, both agree that Ms. Kennedy will require future surgery on her left ankle.  Ms. Kennedy's treating physician and the orthopedic expert for the United States recommend fusion surgery on the left ankle.  The orthopedic expert retained by Ms. Kennedy recommends replacement surgery on the left ankle, but the Court concludes, based on its findings set forth above, that such surgery would not be appropriate in her case and that Ms. Kennedy may not recover damages for such future surgery because such damages are speculative.[9]  Indeed, Ms. Kennedy's expert failed to provide a reasonably certain basis for his estimates as to future medical costs associated with the proposed surgery.  Ms. Kennedy, however, is likely to require a left ankle fusion. Based on the testimony of the Government's orthopedic expert, **Ms. Kennedy is hereby awarded $69,400 for the cost to perform future ankle fusion surgery on Ms. Kennedy's left ankle and to provide for the costs of medications, devices, and related medical needs.**

### 3.    *Ms. Kennedy Does Not Require Private Vocational Rehabilitation Services*

Ms. Kennedy's position as a Marine Corps Personnel Clerk involved the same skills that enable her to obtain gainful employment in a similar position as a

---

[9]Ms. Kennedy's orthopedic expert (Dr. Phillip Kwong) has never performed such a surgery on a patient between the ages of 20-25 (Ms. Kennedy's age group).  *See* RT at 37:20-22 (testimony of Dr. Phillip Kwong, Orthopedic Expert retained by Plaintiffs).

1  civilian.  Ms. Kennedy does not require vocational services for her to transfer
2  successfully to a civilian job in the administration or clerical fields because her
3  position as a Marine Corps Personnel Clerk involved the same special skills that
4  she could perform in the private sector.  Even assuming that Ms. Kennedy requires
5  such vocational rehabilitation, a wide spectrum of free educational and vocational
6  rehabilitation programs and services are available to Ms. Kennedy as a result of her
7  military service.

8  ### 4.   *Ms. Kennedy's Past Lost Earnings Total $32,491*

9  Ms. Kennedy's initial four year term of enlistment with the USMC was to
10 expire in September 2008.  Ms. Kennedy received her full military pay and
11 benefits between October 2006 (when she returned to MCB Twentynine Palms for
12 active duty with the USMC) through January 2008 (when she was transferred to
13 the USMC Temporary Disability Retirement List).   Ms. Kennedy's past lost
14 earnings is $2,041 per month.  This amount comprises Ms. Kennedy's $2,816
15 salary minus her $774 retirement annuity payment from the United States (which is
16 an offset that the United States is entitled as a matter of law).  See RT at 306:12-15.
17 The period of Ms. Kennedy's past lost earnings is nineteen months (from January
18 2008 through August 2009).  This time span comprises the period between Ms.
19 Kennedy's eligibility for reenlistment through the end of trial.

20 For this operative nineteen month period, Ms. Kennedy's gross past lost
21 earnings was $35,635. The gross past lost earnings amount must be reduced by
22 $3,144, the amount of money that Ms. Kennedy earned while employed as a
23 civilian during the same period.  See id. at 304-05:18-13. Accordingly, Ms.
24 Kennedy is hereby awarded a total past lost earnings in the amount of $32,491.

25 ### 5.   *Ms. Kennedy Has No Future Lost Earnings*

26 Ms. Kennedy argues that but for this accident, she would have remained a
27 career Marine and retired with the USMC after at least 20 years of service.  Ms.
28 Kennedy has failed to meet her burden of proving that she could have remained in

-21-

the Marine Corps until retirement.  The factual findings set forth above demonstrate that she was in the post competitive occupational specialty, that she performed at an average level, and that her overall career with the Marines prior to her accident was undistinguished.  Most notably, her superior officer testified that his level of recommendation regarding re-enlistment would have almost certainly resulted in her request for reenlistment beind denied.  Accordingly, because Ms. Kennedy has not presented sufficient credible evidence to establish a reasonable probability that she could have retained active duty status with the Marines, she has failed to prove a loss of future earnings with reasonable certainty.  See JUDICIAL COUNCIL OF CALIFORNIA, CIVIL JURY INSTRUCTIONS § 3903D (revised April 2004).  Moreover, Ms. Kennedy has no lost future earnings because she can obtain employment as an administrative assistant, secretary, or clerical assistant in the private sector with pay exceeding her earnings while she was in the military.

**F.      Ms. Kennedy is Entitled to a Reasonable Award for Non-Economic Damages**

Ms. Kennedy is entitled to an award of general damages for the pain, suffering, scarring, lost mobility, and other consequences of her injuries. Duarte v. Zachariah, 22 Cal. App. 4th 1652 (1994).  The Duarte court noted:

> The fact that there is no market price calculus available to measure the amount of appropriate compensation does not render such a tortious injury noncompensable. "For harm to body, feelings or reputation, compensatory damages reasonably proportioned to the intensity and duration of the harm can be awarded without proof of amount other than evidence of the nature of the harm. There is no direct correspondence between money and harm to the body, feelings or reputation. There is no market price for a scar or for loss of hearing since the damages are not measured by the amount for which one would be willing to suffer the harm. The discretion of the judge or

-22-

jury determines the amount of recovery, the only standard being such
an amount as a reasonable person would estimate as fair
compensation." (Rest.2d Torts, § 912, com. b., pp. 479-480.)

There are many harmful alterations of the body for which it would be
difficult to articulate a precise measure of appropriate compensation.
Garden-variety pain and suffering defies a nice standard for
calculation. The partial but appreciable impairment of function, say of
a sense organ, would obviously be compensable, however difficult it
would be to quantify damages.

22 Cal. App. 4th at 1664-65.

Ms. Kennedy is entitled to an award of general damages due to the numerous
consequences of her injury including the following:

(1) As a result of the open reduction surgery on the left ankle Ms.
Kennedy has five inch long scar on the top of her left foot, RT at 284,
multiple post operative wound scars at the insertion points of the
external fixators on the left ankle, RT at 285,  a post operative scar on
the right ankle from the original open reduction and two subsequent
surgeries,  (Id.), and post operative scars on her left wrist from the
original open reduction and two subsequent surgeries. (Id.)  A number
of the scars are still tender to the touch.  (Id.)

(2) Ms. Kennedy suffers a reduced range of motion in her left ankle,
(id.), and she has an altered gait as a result.  (RT at 286.)

(3) Ms. Kennedy suffers from degenerative joint disease resulting
from traumatic arthritis secondary to the injuries sustained in this
accident. (RT at 286-87.)

(4) As a result of her injuries, Ms. Kennedy cannot run (RT at 19),
wear high heels without pain (RT at 19; 64), cannot walk up or down

-23-

stairs without pain, (RT at 64), cannot dance in a normal manner or ride a bike (RT at 65, 106), and cannot engage in physically demanding work and was rendered "combat ineffective" while in the Marine Corps.  (RT at 60-61.)

(5) During her convalescent period, she was confined to her parents' home post hospital release for 6 months, was confined to a wheel chair for four months, and required her parents' assistance to bathe, dress or use the bathroom.  (RT at 56.)

(6) Ms. Kennedy has a loss of range of motion in her left wrist due to her injuries and is unable to rotate her wrist so that her palm is parallel to a table top with elevating her elbow. (RT at 146-47.)

(7) Because of the present condition of her left ankle, Ms. Kennedy has continuous pain, limitation of her activities, and decreased weight bearing. (RT at 18.)  The pain in the left ankle is progressive, and the Government's expert described the pain as a 7-8 on a 10 scale with a poor outcome for the left ankle. (RT at 63-64; 277.)   She will also continue to have pain and slow degenerative changes in her right ankle.  (RT at 278.)

In these circumstances, Ms. Kennedy's future pain and suffering is reasonably certain to occur.  See Silvester v. Scanlan, 136 Cal. App. 107, 110 (1934).

Attempting to determine a monetary value to be placed on these injuries is difficult because, as Duarte pointed out, there is no market calculation to be applied in these circumstances.  One element often considered in determining a proper award is the cost of the medical services rendered to address the claimant's injuries.  In this case, the past medical expenses together with anticipated future medical costs is approximately $345,000.  However, that is only a starting point. The Court takes into account that Ms. Kennedy has had nine separate surgical procedures, each of which carried with it some degree of risk and each of which

1    brought with it the worry and anxiety that necessarily accompanies surgery.  The
2    Court also takes into account the extended period of rehabilitation, and the time
3    that she spent in a wheel chair, in assessing her general damages.  The Court
4    further considers the scarring and disfigurement that resulted from her corrective
5    surgery, and the number of years that Ms. Kennedy will endure the consequences
6    of her injuries – in this case approximately 60 years from the date of injury.  These
7    factors persuade the Court that a simple multiplier would not properly account for
8    all of the consequences of Ms. Kennedy's injuries.  On the other hand, the sum of
9    $8 million, which has been requested by Ms. Kennedy is excessive and would
10   amount to a payment of $133,333 per year over a 60 year period.

11          Taking all of those factors into account, the Court concludes that Ms.
12   Kennedy should be awarded $2.1 million in general damages.

### IV.

### CONCLUSION

15          Plaintiff Amanda Kennedy is awarded damages in the total sum of
16   $2,201,891.  Plaintiff Peter Kennedy is awarded damages in the total sum of
17   $11,168.62.  Plaintiff is to prepare and submit to the Court a Proposed Judgment
18   no later than Monday, October 19, 2009.

20   Dated: October 13, 2009

_____
**THE HONORABLE GARY A. FEESS**
UNITED STATES DISTRICT COURT JUDGE

-25-